Filed 7/12/22  P. v. Green-Geiger CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090722 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE001073) |
| v. | |
| MALIK GREEN-GEIGER, | |
| Defendant and Appellant. | |

After a jury convicted defendant Malik Green-Geiger and his three codefendants[1] of willful, deliberate, and premeditated attempted murder, the trial court imposed on defendant an aggregate prison sentence of 69 years to life, including a term for a firearm enhancement that the trial court arrived at by doubling the penalty pursuant to California's "Three Strikes" law.  On appeal, defendant contends his conviction should

---

[1] Elton Ackerson, Dereck Gi, Jr., and Lonnie Kilgore.

1

be reversed, because: (1) an invalid theory of criminal liability was utilized; (2) jury instructions were vague and confusing in violation of due process principles; and (3) there was insufficient evidence of his guilt. Regarding his sentence, defendant argues (4) the firearm enhancement was improperly doubled, and (5) imposition of "any additional time" for the willful, deliberate, and premeditated nature of his crime was unauthorized, because that allegation was not in the accusatory pleading.

We agree with defendant that the trial court improperly doubled the sentence for the firearm enhancement. We disagree with defendant's other claims.

In supplemental briefing, defendant argues we must reverse the jury's gang-related enhancement findings in light of recent statutory changes made by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699). We agree with this argument, and will vacate the gang-related enhancement findings and remand for further proceedings.[2]

BACKGROUND

Around 2:34 p.m. on October 20, 2016, M.G. parked his car in front of a relative's house on High Street, in Sacramento's Del Paso Heights neighborhood. When he got out of the car, a bullet struck him in the groin. Another 10 to 14 shots, from at least two guns, were fired at M.G.

Witness No. 1 was repairing a fence at a nearby house that day, and he saw the shooting as he crossed the street to borrow a ladder. He remembered a dark-colored sedan that sped away after the shooting had been parked in a crooked manner on the street.

Witness No. 2 was on her front porch when she heard multiple shots and ran inside with her son. When she looked at High Street through her front window, she saw a black

---

[2]     This matter was assigned to the panel as presently constituted in June 2022.

2

Lexus backing out of High Street. A lighter colored car left the area headed in the same direction just before the black Lexus.

Police found two sets of shell casings at the scene of the shooting, about 40 feet apart: 9-millimeter casings and .45-caliber casings.

A. *Evidence of Defendant's Involvement*

*Defendant's Phone*

The day after the shooting, investigators sought to confirm defendant's phone number and vehicle. To confirm defendant's phone number, an investigator drove by defendant as he walked down the street, called the suspected phone number, heard the line ringing, and saw defendant "with the phone in his hand start to bring [the phone] up to his ear." "[B]ecause [the investigator] was driving [he] couldn't keep watching" defendant, so the investigator did not see defendant hold the phone "against his ear." The investigator "looked away. But then a male voice answered the phone."

On cross-examination, the investigator confirmed that he did not see defendant talk into his phone, and the person who answered the phone did not identify himself.

On redirect, the following occurred:

"[Prosecutor:] Did you form the opinion that [defendant] was using [the phone number] when you called that . . . number on October 21st, 2016?

"[Defense counsel:] Objection, relevance.

"[Trial court:] Overruled.

"[Witness:] I did, yes.

"[Prosecutor:] Why?

"[Witness:] Based on my observations and the observations of other agents who were at the scene.

"[Defense counsel:] Objection, foundation, move to strike.

"[Trial court:] Sustained. Stricken.

"[Prosecutor:] Well, what about his own observations?

"[Prosecutor:] What about your own observations gave you that opinion?

"[Witness:] My observation -- what I observed was consistent with [defendant] answering the phone, but I did not base my opinion solely on my own observations.

"[Prosecutor:] Okay. That is all I have.

"[Defense counsel:] Move to strike then.

"[Trial court:] Over -- well -- overruled."

At 11:45 a.m. on the day of the shooting, there was a 27-second call from defendant's phone to codefendant's Gi's phone. About three minutes after the shooting, at 2:37 p.m., there was a 33-second call from defendant's phone to Gi's phone. Regarding the 2:37 p.m. call, cell phone tower data reflected that defendant's phone and Gi's phones were communicating with each other via two cell phone towers "in the same location." At 2:52 p.m., defendant's phone was communicating with the same cell phone tower that "encompasse[d] his residence."

*Defendant's and Codefendants' Cars Around the Time of the Shooting*

The day after the shooting, an investigator saw defendant driving a black Lexus.[3] A records check indicated defendant was the registered owner of the black Lexus.

Around 14 minutes before the shooting, a police camera captured video footage of defendant's black Lexus at an intersection about three blocks away from the shooting. In front of the black Lexus and traveling in the same direction, were two cars associated with two of defendant's codefendants: a silver Lexus (codefendant Ackerson) and a silver Chrysler 200 (codefendant Gi).

---

**3** After the close of evidence, defendant and the People stipulated that defendant's car was "dark navy blue rather than black." In argument to the jury, the prosecutor maintained defendant's Lexus was "very dark blue, . . . it can be mistaken for a black car."

4

A private video camera close to the shooting captured (i) a silver Chrysler 200 (moving faster than other cars) about 20 seconds after the shooting, and (ii) a dark-colored Lexus (also moving faster than other cars) about 26 second after the shooting.

B. *Relevant Additional Codefendant Evidence*

At 11:06 a.m. on the day of the shooting, there was a call from Kilgore's phone to Gi's phone. About three minutes later, there was a call from Gi's phone to Kilgore's phone.

From 11:51 a.m. to 1:01 p.m. on the day of the shooting, there were eight calls placed between Ackerson's phone and Gi's phone.

For 80 minutes, beginning just after 1:00 p.m. on the day of the shooting, there were no calls between any of the four codefendants' phones.

About 13 minutes before the shooting, at 2:21 p.m., there was a call between Ackerson's and Gi's phones.

In the four minutes after the shooting, there were three calls between Ackerson's phone and Gi's phone, followed by the call from defendant's phone to Gi's phone.

A Global Positioning System (GPS) tracker that had been placed on Ackerson's silver Lexus before the shooting, reflected that Ackerson's silver Lexus was at Strawberry Manor Park at 1:01 p.m., and not moving. Ackerson's silver Lexus was moving again at 2:15 p.m., when it left the park.[4] Around one minute after the shooting, the silver Lexus was near the general are of the shooting, but moving away from it.

From 1:08 p.m. to 2:08 p.m., Ackerson's phone was in the general area of Strawberry Manor Park, and at 2:52 p.m. (about 18 minutes after the shooting), the phone was in the area of an apartment complex where defendant lived.

---

**4** The GPS data reflecting the silver Lexus's time and location was consistent with video evidence referenced above.

At 1:09 p.m., Gi's phone was near Strawberry Manor Park. At 2:21 p.m. and 2:35 p.m., the phone was near a cell phone tower located on a high school football field a couple of blocks from the shooting. Gi's phone was in the vicinity of defendant's apartment at 3:06 p.m.

Kilgore's phone was near Strawberry Manor Park beginning at 1:04 p.m. until at least 1:34 p.m., when no data was available (possibly because the phone ran out of battery or was turned off). At 3:35 p.m., Kilgore's phone was near defendant's apartment.

In January 2017, police found a 9-millimeter gun in an apartment connected to Ackerson. A firearms examiner testified he believed that 9-millimeter gun was fired at the October 20, 2016, shooting.

C. *Gang Evidence*

An expert on "African American criminal street gangs" in Sacramento testified that, in his opinion, defendant and his three codefendants were members of subsets of the Oak Park Bloods criminal street gang (one of two "primary gangs that are against each other in Sacramento," under which "the other smaller gangs line up").

The expert explained to the jury how, in numerous social media posts (copies of some of which the jury saw), defendant and the three codefendants displayed guns and gang signs, wore gang clothing, and made gang-related comments. In some of the posts, some of the codefendants were together. For example, People's exhibit No. 92 was a photograph of all four men (and several others), and People's exhibit No. 97 was a photograph posted to defendant's social media account that showed defendant with Kilgore and Gi.

The expert testified he believed M.G., the shooting victim, was affiliated with a criminal street gang that was a subset of the main rival of the Oak Park Bloods, and that the neighborhood where the shooting occurred (Del Paso Heights) was claimed by the rival gang.

6

After the prosecutor presented a hypothetical scenario that mirrored many of the facts surrounding the shooting in this case (including the different subset gang memberships of all four defendants, and that the hypothetical gang members were all "previously acquainted" and traveling "in a straight line in three separate cars"), the expert explained that a "shooting of the rival gang member" "benefit[ted] the gang that commits the shooting because they are taken seriously," as the "four people . . . are . . . representative of the entire gang as a whole."

D. *Jury Instructions*

Using CALCRIM No. 416, the trial court instructed the jury on the uncharged conspiracy as a theory of liability, naming "attempted murder" as the substantive offense that was the object of the conspiracy. Relevant here, the trial court explained:

"The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goals of the conspiracy. To prove the defendant is a member of a conspiracy, the People must prove that, one, the defendant intended to agree and did agree with one or more of the other defendants to commit the *attempted murder*.[5] Two, at the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit *attempted murder*. Three, one of the defendants committed at least one of the following overt acts to accomplish the *attempted murder*: One, drove from Strawberry Manor into Del Paso Heights, or, two, brought a loaded handgun into Del Paso Heights from Strawberry Manor, or, three, shot [M.G.], and, four, at least one of these overt acts was committed in California.

---

**5**     At a jury instruction conference, the trial court denied a defense request to name M.G. as the intended victim of the conspiracy.

"To decide whether a defendant or another member of the conspiracy committed these overt acts, consider all of the evidence presented about the acts. To decide whether a defendant and one or more of the alleged members of the conspiracy intended to commit *attempted murder*, please refer to the separate instruction I will give you on that crime.

"The People must prove that the members of the alleged conspiracy had an agreement and specific intent to commit *attempted murder*. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime." (Italics added.)

The trial court instructed the jury on attempted murder with CALCRIM No. 600. Relevant here, the trial court explained: "The [d]efendants are charged in Count 1 with attempted murder. To prove the defendant is guilty of attempt[ed] murder, the People must prove that, one, the defendant took at least one direct but ineffective step toward killing [M.G.], and, two, the defendant had the specific intent to kill [M.G.]."

The trial court further instructed the jury on willful, deliberate and premeditated attempted murder, using CALCRIM No. 601, explaining, as relevant here:

"If you do find a defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and deliberately and with premeditation.

"The defendants acted willfully if they intended to kill when they acted. The defendants . . . deliberated if they carefully weighed the consideration for and against the choice and knowing the consequences decided to kill. The [d]efendants acted with premeditation if they decided to kill before completing the act of attempted murder."

The trial court and the parties discussed potential jury instructions (including CALCRIM No. 601) at an August 6, 2019, proceeding, before the People rested on

8

August 14, 2019.  No one objected to the trial court's proposal to provide CALCRIM No. 601 to the jury.

E.  *Closing Arguments*

*Prosecution*

The prosecutor explained to the jury that the uncharged "conspiracy . . . [was] the legal way . . . to hold everybody accountable for their actions in this case."

"These guys had an agreement to do what they did.  They all drove into a neighborhood together, and they did what they did.  It doesn't matter . . . who was where or who did what, as long as one of them did it, something in furtherance of the conspiracy, which is exactly what happened.

"Attempted murder. . . .  All you need is one direct, but ineffective step towards killing another person, and, two, an intent to kill when you did it.

"In this case what evidence do you have of an attempted murder?  These guys were in Strawberry Manor Park for an hour. . . .  *They agreed to travel into rival gang territory to kill a rival gang member. . . .*

"They tried.  Okay?  This is your direct, but [ineffective] step.  You can pick any number of steps in this case.  Driving there, bringing a gun, those are steps as well.  They tried.  Fourteen times with two shooters."  (Italics added.)

"Members of a gang don't travel into rival gang territory, three-cars deep, multiple-guns deep, fire fourteen rounds at another person, without *trying to kill them*."  (Italics added.)  "The ineffective step is that they failed.  They don't get to get off the hook for *trying to kill* [the victim] just because they stink at shooting. . . .  They failed to kill him, but they did hit him."  (Italics added.)

A bit later, the prosecutor said:  "This was an attempted murder.  Don't let anybody else sell you anything else.  [¶] . . . [¶]  This is the allegation underneath the attempted murder, that it was done with premeditation and deliberation, okay?"

Returning to the uncharged conspiracy, the prosecutor said:

"In this case what you have is a planned, conscious decision to hunt down rival gang members in the middle of the day on October 20th of 2016. All members who decided to do this, everybody, are liable for the shooter's acts. Everybody is responsible in a conspiracy.

"These are the requirements: Each defendant intended to agree and did *agree to commit attempted murder*. . . . The defendant and at least one other intended that at least one member would *commit attempted murder*. [¶] . . . [¶]

"At least one defendant did at least one of these . . . overt acts . . . ." (Italics added.)

Addressing the "agreement" between the defendants, the prosecutor said: "There needs to be an agreement to do this. How do you prove an agreement?" "Number one, proof of a physical meeting is not required, but you have it. . . . It is not required, but you have it, at Strawberry Manor Park." "Between 1:01 p.m. . . . and 2:21 p.m. there are no phone calls between any of these defendants. Why? Because . . . they are meeting together at Manor Park. There is absolutely no reason to call your . . . fellow gang member, if you are with them. These guys were calling each other throughout the entire morning, and then the calls stopped for this period of time."

"[A]n agreement between these four defendants can be inferred from the conduct itself of the conspirators. . . . It's damning to these guys. You have . . . Ackerson's silver Lexus that has a tracker on it going through the intersection . . . ." "You have . . . Gi's Chrysler following it four seconds later right behind it. You have [defendant']s Lexus four seconds later. Traveling together . . . after meeting in the Manors. An agreement can be inferred from what they are doing."

"Think of it as yourself. If you were to see your car and two cars of your co-workers driving to a bar after work . . . you are going to infer that you all agreed to go to the bar to have a drink after work. . . . When you have three guys, one after the other,

10

driving into rival gang territory, you can infer they had an agreement to do something in that territory by virtue of their conduct alone."

Homing in on the evidence regarding defendant's involvement, the prosecutor said "historical cellphone data" "show[ed] [defendant's] tower data leaving the same area. This is three minutes after the shooting when he is making a phone call to . . . Gi." "We know [defendant] is at the park, because he drives from the park. His license plate is captured driving through with the other two cars. That is how you know he was there."

*Defense*

Defense counsel told the jury that "there [was] no direct evidence that anyone ID's [defendant]." Defense counsel agreed evidence that defendant's "car did go through the intersection" was "circumstantial evidence." "But how strong is that circumstantial evidence?" counsel asked the jury.

Regarding the phone evidence, counsel argued, "There [was] no context of th[e] phone call," which "could be circumstantial evidence of [defendants] trying to meet up for lunch. There is nothing. . . . It's just circumstantial evidence, and the instructions say if both are reasonable, you as the jury, must go for the one that . . . lends itself to innocence."

Counsel emphasized that the investigators' "attempt to see if [defendant] was actually using the phone" the People ascribed to him occurred "after the shooting. Not the day before, not the day of, after." There was "[n]o evidence . . . that the phone was registered or purchased by [defendant]." Further, the investigator "didn't actually . . . see [defendant] answer the phone." And defendant "did not identify [himself] . . . ."

*Prosecution Rebuttal*

In rebuttal argument, the prosecutor emphasized the importance of cell phone tower data vis-à-vis defendant: "[H]is tower data shows him pinging off the same exact tower as . . . Gi as they are hightailing it out of Del Paso Heights."

11

F. *Verdicts and Judgment*

On August 19, 2019, a jury found all four defendants guilty of attempted murder, count one of the information. (Pen. Code, §§ 664, 187, subd. (a).)[6] Relevant here, the jury further found: (i) the attempted murder was done willfully and with deliberation and premeditation (though this allegation was not in the information); and (ii) one of the principals personally used and personally discharged a firearm during commission of the crime, causing great bodily injury (§ 12022.53, subds. (b), (c), (d)).

Later that month, after defendant admitted he suffered a prior serious felony conviction within the meaning of section 667, the trial court imposed an aggregate prison term of 69 years to life, consisting of: 14 years to life for attempted murder (seven years to life doubled under the Three Strikes law (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1))); 50 years to life for the firearm enhancement under section 12022.53, subdivision (d) (25 years to life doubled under the Three Strikes law); and a five-year enhancement under section 667, subdivision (a). The trial court imposed but stayed other terms not material to this appeal.

Defendant timely appealed.

DISCUSSION

I

*The Conspiracy Instruction*

A. *Attempted Murder*

Invoking our decision in *People v. Iniguez* (2002) 96 Cal.App.4th 75, 79 (*Iniguez*), defendant argues "there is no such thing as a conspiracy to commit attempted murder," because such a conspiracy "is a 'conclusive legal falsehood.' " Defendant contends the

---

[6] Further undesignated statutory references are to the Penal Code.

error was prejudicial, because "[w]ithout the uncharged conspiracy, there was no theory presented to the jury under which [defendant] could have been convicted."

The People argue the claim is forfeited on appeal, because defendant did not raise it in the trial court.

On the merits, the People argue our analysis in *Iniguez* was incorrect, as "the proper way to construe an 'agreement to commit an attempted crime' would be as an 'agreement to attempt to commit a crime,' which is logically the same as an 'agreement to commit a crime,' given that one can never be sure of success." The People also argue that *Iniguez* is distinguishable, because here, defendant was *not* convicted of the crime of conspiracy, as the theory was merely "employed . . . to attach criminal liability" for the attempted murder. Further, the People argue, "in the context of the whole instructions," "the meaning the instructions communicated to the jury was clear and unobjectionable," because "before the jury could find [defendant] guilty of attempted murder under a conspiracy theory, it still had to conclude that the conspirators harbored a specific intent to kill the intended victim."

"In any event," the People argue, "the error was harmless" because of the jury's finding that defendant had the specific intent to commit a willful, deliberate, and premeditated murder.

We conclude that, assuming for the sake of argument the instruction was erroneous (and not merely ambiguous), any error was harmless beyond a reasonable doubt, because the challenged language was unimportant in relation to everything else the jury considered on the issue of defendant's coconspirator liability for attempted murder.

1. *The Claim Is Not Forfeited on Appeal*

"Because [defendant's] contention is that the instructions caused him to be convicted under an invalid legal theory, this contention need not be preserved by objection in order to be considered on appeal." (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*); see *People v. Valdez* (2012) 55 Cal.4th 82, 151.)

13

2. *Legal Backdrop*

California Supreme Court decisions have " 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' " (*People v. Valdez*, *supra*, 55 Cal.4th at p. 150.)

In *Iniguez*, we concluded that the crime of conspiracy to commit attempted murder is a "conclusive legal falsehood," because murder "requires a specific intent to actually commit the murder, while the agreement underlying [a] conspiracy [to commit attempted murder] contemplate[s] no more than an ineffectual act. No one can simultaneously intend to do and not do the same act, here the actual commission of a murder." (*Iniguez, supra*, 96 Cal.App.4th at p. 79.) In other words, "under a traditional conspiracy approach, one cannot conspire to *try* to commit a crime." (*People v. Johnson* (2013) 57 Cal.4th 250, 264.)

" 'Misdescription of an element of a charged offense is subject to harmless error analysis and does not require reversal if the misdescription was harmless beyond a reasonable doubt.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 69; see *People v. Aledamat* (2019) 8 Cal.5th 1, 11-12 [if trial court instructs jury with only an invalid theory of liability, harmless error review, under *Chapman v. California* (1967) 386 U.S. 18, is appropriate].)

"[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] we must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" ' [citations]." (*People v. Brooks*, *supra*, 3 Cal.5th at p. 70.)

14

3. *Analysis*

Recently in *Powell*, after "examin[ing] 'the entire cause, including the evidence, and consider[ing] all relevant circumstances' [citation], we conclude[d] that a rational jury would have found [defendant] guilty of second degree murder absent the instructional error." (*Powell, supra*, 63 Cal.App.5th at p. 718, quoting *People v. Aledamat, supra*, 8 Cal.5th at p. 3.) We ruled that because the error "was 'unimportant in relation to everything else the jury considered on the issue' of [defendant's] liability for second degree murder," it was harmless beyond a reasonable doubt under *Chapman*. (*Powell, supra*, 63 Cal.App.5th at p. 718; *People v. Neal* (2003) 31 Cal.4th 63, 86.)

"Of key importance to our determination that the instructional error . . . was harmless [was] the fact that the prosecutor did not rely on" the invalid theory, as "[c]ourts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless." (*Powell, supra*, 63 Cal.App.5th at p. 715.) "Under the circumstances of th[e] case," we determined, "given that the jury was never steered in [an] [invalid] direction, it [was] clear" the instructional error was harmless. (*Id.* at p. 716.)

Here, too, the trial court's instructional error (identifying *attempted* murder as the object of the alleged conspiracy) was harmless beyond a reasonable doubt, because it was unimportant in relation to everything else the jury considered, given the evidence and closing argument.

The prosecutor explained to the jury: (i) "conspiracy . . . [was] the legal way . . . to hold everybody accountable for their actions in this case"; (ii) for attempted murder, "[a]ll you need is one direct, but ineffective step towards killing another person, and, two, an intent to kill when you did it"; (iii) "evidence . . . of [the] attempted murder" included that defendants "agreed to travel into rival gang territory *to kill* a rival gang member"; (iv) "[m]embers of a gang don't travel into rival gang territory, three-cars deep, multiple-guns deep, fire fourteen rounds at another person, without *trying to kill* them";

15

(v) defendants "don't get to get off the hook *for trying to kill* [the victim] just because they stink at shooting." (Italics added.)

Defense counsel argued there was no "direct evidence" of defendant's involvement in the shooting, and the circumstantial evidence was insufficient.

Thus, while the trial court characterized the alleged uncharged conspiracy as one to commit *attempted* murder (and the prosecutor similarly framed the issue on one occasion in closing argument when describing the theory of liability, generally), it is clear from the parties' closing arguments that "the jury was never steered" toward a theory of defendant's liability for attempted murder that depended on this inartful formulation. (*Powell, supra*, 63 Cal.App.5th at p. 716.) The prosecutor argued the facts showed defendants conspired to travel into rival gang territory as a group to "kill" and to "try[ ] to kill" a rival gang member. Defense counsel encouraged the jury to doubt that defendant was in that group. Because the distinction between conspiring to murder and conspiring to attempt to murder was unimportant in relation to everything else the jury was asked to consider on the question of defendant's liability for attempted murder, the instructional error was harmless under *Chapman*. (Cf. *Boyde v. California* (1990) 494 U.S. 370, 380-381 [because "[j]urors do not . . . pars[e] instructions for subtle shades of meaning in the same way that lawyers might," a "commonsense understanding of the instructions in the light of all that has taken place at the trial" is "likely to prevail over technical hairsplitting"].)

B. *Vagueness*

Acknowledging that "the law of attempted murder does not require the prosecution to plead the identity of the victim by name," defendant argues the conspiracy instruction was "vague and confusing in violation of the Due Process Clause" because the trial court rejected defense proposed language that would have identified M.G. as "the victim of the attempted murder conspiracy" for purposes of CALCRIM No. 416. The trial court's failure to identify M.G. "as the target of the attempted murder in the pinpoint

16

*instruction on conspiracy*"—even though "the instruction on the intent requirement in the *attempted murder instruction* named [M.G.] specifically"—was "prejudicial error," defendant maintains, because the instruction as given "would have permitted the jury to have found the agreement underlying the uncharged conspiracy was to attempt to commit a murder of someone that was not [M.G]." (Italics added.)

The People argue the trial court did not err.

" 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' [Citation.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Defendant's argument is not persuasive. Regardless whether—in isolation—the instruction as given "would have permitted the jury to have found the agreement underlying the uncharged conspiracy was to" murder *someone*, not M.G. necessarily, the instruction was not vague or confusing in light of the entire charge of the court, as M.G. was named both in one of the conspiracy's overt acts and in the attempted murder instruction.[7] Accordingly, there is not a reasonable likelihood the jury misunderstood and misapplied the instruction as defendant contends.

---

[7] To the extent defendant's claim is that he had insufficient *notice* regarding who the prosecution intended to prove was the attempted murder victim, that contention lacks merit, because the information named M.G. as the victim of the attempted murder, and the evidence at trial was consistent with that criminal pleading.

## II

### *Sufficiency of the Evidence*

Conceding "[t]here was sufficient evidence from which the jury could have inferred that [his three codefendants] met at the park and made an agreement to attempt to murder a rival gang member," defendant argues "the evidence was insufficient to prove" *his* involvement in the uncharged conspiracy.[8] Specifically, defendant contends the evidence was "insufficient to support the finding that [defendant] was a party to any agreement to commit the target offense," as "inferring . . . that [defendant] was present at the meeting" in Strawberry Manor Park "and agreed to the target offense of attempted murder is unreasonable," and "other reasonable inferences can be drawn" from the circumstantial evidence. The People disagree. We conclude there is sufficient evidence for defendant's conviction.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]' [Citation.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 61-62.)

"If our review of the record shows that there is substantial evidence to support the judgment, we must affirm, even if there is also substantial evidence to support a contrary conclusion and the jury might have reached a different result if it had believed other evidence." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1166-1167.)

---

[8]     Under this claim, defendant also asserts a "legal" problem with his conviction is that it "was based on . . . a 'conclusive legal falsehood.' "  But as we have already resolved a version of this contention against defendant, above, we will not address the contention again here.

"Circumstantial evidence often is the only means to prove conspiracy. [Citations.] There is no need to show that the parties met and expressly agreed to commit a crime in order to prove a conspiracy. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The inference can arise from the actions of the parties, as they bear on the common design, before, during, and after the alleged conspiracy." (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 999.)

A. *The Meeting in Strawberry Manor Park*

Contrary to defendant's suggestion, we need not determine whether there was substantial evidence that defendant was physically present at the meeting in Strawberry Manor Park to uphold his conviction. While the prosecutor theorized in closing argument that the meeting in Strawberry Manor Park evidenced the agreement between defendants to try to kill a rival gang member, the prosecutor also emphasized—consistent with the instructions the trial court provided to the jury—that "proof of a physical meeting [was] not required." (See *In re Nathaniel C.*, *supra*, 228 Cal.App.3d at p. 999.)

B. *Relevant Evidence*

Here, video cameras captured defendant's dark-colored Lexus travelling near the scene of the shooting with Ackerson's car and Gi's car about 14 minutes before the shooting. About 20 seconds after the shooting, a video camera close to the shooting captured a vehicle matching Gi's car moving faster than other cars in the video, and then about six second later, the same video camera captured a vehicle matching defendant's car also moving faster than other cars in the video. In the four minutes after the shooting, there were three calls between Ackerson's phone and Gi's phone, followed by a call from defendant's phone to Gi's phone.[9] The phones in the call between defendant's phone and

---

[9] Contrary to defendant's contention, there was sufficient evidence that the phone the prosecution ascribed to defendant *was* used by defendant on the day of the shooting.

19

Gi's phone used cell phone towers "in the same location," suggesting the two phones were very close to each other.  Cell phone data also indicated:  (a) about 20 minutes after the shooting (around 2:52 p.m.), defendant's phone and Ackerson's phone were at defendant's apartment complex; (b) Gi's phone was there about 15 minutes later; and (c) Kilgore's phone was there about 30 minutes later still.  Thus, phones belonging to all four codefendants were at defendant's apartment complex within about one hour of the shooting.

Given defendant's concession that there was sufficient evidence that his three codefendants met at Strawberry Manor Park and made an agreement to try to murder a rival gang member, and in light of the evidence described above (indicating defendant travelled with his codefendants to the shooting, called one of his codefendants minutes after the shooting, and then gathered with his codefendants at one location within an hour after the shooting), a reasonable jury could conclude that defendant *was* party to an agreement with his codefendants to commit murder.  (See *In re Nathaniel C.*, *supra*, 228 Cal.App.3d at p. 999 [the inference of a conspiracy to commit a crime "can arise

---

The investigator's testimony that—in light of his observations the day after the shooting (that (a) defendant raised a cell phone to his ear when the investigator dialed the phone number he suspected belonged to defendant, (b) the investigator heard a male answer the phone, (c) but the male did not identify himself)—"what [he] observed was consistent with [defendant] answering the phone," was not "an opinion based on hearsay" that "lack[ed] . . . foundation."

This is so because "[a] ' "lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." [Citations.]' " (*People v. Dalton* (2019) 7 Cal.5th 166, 231.) " '[A] witness may testify about objective behavior and describe behavior as being consistent with a state of mind.' " (*Id*. at pp. 231-232.)

To the extent the investigator's testimony is unclear regarding the basis of his conclusion defendant answered the phone that the investigator called, we do not presume error.  (Cf. *People v. Garcia* (2020) 46 Cal.App.5th 123, 167 ["Where the record is unclear about the basis of a witness's testimony, and the appellant did not seek at trial to develop the record, reviewing courts will not presume" error].)

from the actions of the parties, as they bear on the common design, before, during, and after the alleged conspiracy"].)

Thus, this claim is unpersuasive.

## III

### *Improper Doubling of a Firearm Enhancement*

Defendant contends, and the People concede, the trial court erred when—in its oral pronouncement of judgment[10]—it doubled the term for the firearm enhancement pursuant to the Three Strikes law.  We agree.

"If, as here, a defendant has one prior strike conviction that has been pleaded and either proved or admitted, the determinate term for the current felony offense is twice the term otherwise provided as punishment.  (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1).)  However, enhancements are added after the determination of the base term and are not doubled.  (*People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433 ['[i]n sentencing a defendant who has one prior strike, the court may not double any enhancements it imposes']; *People v. Dominguez* (1995) 38 Cal.App.4th 410, 424 ['the terms for the offenses themselves must be doubled for a "second strike" defendant, but no term for an enhancement is doubled']; see *People v. Ramirez* (1995) 33 Cal.App.4th 559, 573-574.)  As the People now acknowledge, the trial court erred in doubling . . . the . . . firearm[ ] enhancement[ ] imposed . . . ."  (*People v. Sok* (2010) 181 Cal.App.4th 88, 93-94, fns. omitted.)

## IV

### *Failure to Allege Premeditation and Deliberation*

Defendant argues the operative charging document did not comply with a statutory requirement that the allegation the attempted murder was premeditated and deliberate

---

[10]    The abstract of judgment does not reflect the doubled term.

21

must be expressly charged in the accusatory pleading, and therefore the trial court's imposition of "any additional time for the allegation that the attempted murder was willful, deliberate and premeditated" was improper. The People concede the failure to allege premeditation and deliberation, but argue we should reject this claim because (i) it is forfeited on appeal, (ii) the informal amendment doctrine applies, and (iii) the error is harmless. Citing *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*), defendant suggests "harmless error analysis does not apply" here, because "notice was received too late to cure the defective pleading."

We conclude the error was harmless because defendant has not shown he would have acted differently had the error not occurred. Therefore we do not address the People's other proposed bases for rejection of this claim.

A. *Relevant Statutes*

Section 664, subdivision (a), provides: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder *shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading* and admitted or found to be true by the trier of fact." (Italics added; see generally *People v. Houston* (2012) 54 Cal.4th 1186, 1226-1228 [considering a claim pursuant to § 664, subd. (a)].)

Section 960 provides: "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."

B. *Harmless Error Analysis Is Proper*

In *Mancebo*, our Supreme Court interpreted the "One Strike" law (§ 667.61) and held that an enhancement had to be stricken because it was never pleaded, even though the elements necessary to establish it were implicit in the operative charging document and found by the jury. (*Mancebo, supra*, 27 Cal.4th at pp. 752-753.) The challenged enhancement did not arise until the sentencing hearing. (*Id.* at p. 745.) Our Supreme Court indicated that, in some circumstances, a harmless error analysis of this kind of pleading error will be inappropriate. (*Id.* at p. 749 [citing *People v. Hernandez* (1988) 46 Cal.3d 194, 208-209 for the proposition that " '[i]t is unnecessary to . . . engage in a harmless-error analysis when defendant's due process right to notice has been completely violated' "].)

Recently, in *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*), our Supreme Court rejected on the merits a harmless error argument vis-à-vis a prosecutorial pleading error, explaining that "[t]he record d[id] not support a conclusion that [defendant] had adequate notice of the prosecution's intention to seek" certain enhancements, (*id.* at p. 963) and "[t]he prosecution's intention to ask for the . . . enhancements only became apparent on the day of the sentencing hearing." (*Id.* at p. 964.) Elsewhere in *Anderson*, the court emphasized the importance of distinguishing between prosecutorial pleading error, per se, and the question whether the error is prejudicial. (*Id.* at p. 957 ["These are not, however, reasons to conclude that no pleading error occurred; they are reasons to conclude the error was not prejudicial."].)

To the extent there is tension between *Mancebo* and *Anderson* on the question whether harmless error analysis is proper in cases of prosecutorial pleading error, we follow *Anderson*'s signal that harmless error analysis *is* proper. (See *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 176-177, fn. 6 ["When decisions of our Supreme Court differ on a legal point, we must follow the more recent pronouncement."].)

C. *Defendant's Burden to Show the Error Was Not Harmless*

When considering an "error under state statutory law alone, review occurs under the 'reasonably probable' standard of [*People v.*] *Watson* [(1956)] 46 Cal.2d [818,] 836, and the defendant bears the burden of showing that he or she would have acted differently had the error not occurred. [Citation.] This assignment of the burden can be important, as it was in *People v. McClellan* (1993) 6 Cal.4th 367. *McClellan* considered a trial court's failure to advise the defendant that his guilty plea would make him subject to registration as a sex offender under section 290. (*McClellan*, at p. 372.) On appeal, the defendant in *McClellan* argued that the error automatically entitled him to withdraw from the plea agreement. (*Id.*, at p. 374.) Although [our Supreme Court] agreed with the defendant that an error occurred under state law (*id.*, at p. 376), it disagreed regarding the resulting remedy. *McClellan* concluded that the defendant bore the burden of showing he would have made a different decision with a proper advisement, and determined that he had not met that burden: 'Although defendant allege[d] that had he properly been advised, he would not have entered his plea of guilty, there [was] nothing in the record on appeal to support this contention. Thus, [our Supreme Court] conclude[d] defendant ha[d] failed to meet his burden of establishing prejudice.' (*Id.*, at p. 378.)" (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 181.)

Whether the pleading error here was harmless is a question of state statutory law. (See §§ 664, subd. (a), 960; *Anderson*, *supra*, 9 Cal.5th at p. 963 [citing § 960 as the relevant statute for purposes of harmless error analysis].) Accordingly we analyze the question under the rubric of *People v. Watson*, cognizant that defendant bears the burden to demonstrate he would have acted differently had the pleading error not occurred.[11]

---

[11] Defendant's framing of this claim as one of "due process" does not shift his burden to the People. This is so even though section 664, subdivision (a), "may serve to protect" due process principles of notice. (*People v. Sivongxxay*, *supra*, 3 Cal.5th at

24

In *Anderson*, our Supreme Court, in rejecting the People's harmless error argument, explained that when defendant learned the prosecutor's "actual intentions regarding the enhancements . . . midway through the sentencing hearing," it was "too late to consider the prosecution's pretrial plea deal or reshape his trial strategy." (*Anderson, supra*, 9 Cal.5th at p. 964; see *id*. at pp. 951-952 ["Before trial, the prosecution offered to strike all charges and enhancements if Anderson pleaded guilty to second degree murder with a 15-year-to-life penalty, as well as to one count of robbery and one count of being an active participant in a street gang"; after trial, Anderson was sentenced "to a total of 189 years to life, including a total of 125 years to life for the enhancements"].)

Here, defendant has made no effort to show how he would have acted differently had there been a properly pleaded allegation of premeditation and deliberation.[12] We conclude defendant has not met his burden under *People v. Watson*.[13] (Cf. *People v. Thomas* (1987) 43 Cal.3d 818, 826, 832 [considering an accusatory pleading error in light of section 960 and other principles, and ruling that "even if the accusatory pleading was defective, defendant has not demonstrated he was misled to his prejudice and reversal is therefore inappropriate in this case"].) On this basis, the claim is rejected.

---

p. 184 ["Our precedent, and that of other jurisdictions, has recognized a difference between a failure to comply with a statutory requirement that may serve to protect a constitutional right, and a violation of the underlying constitutional right itself."].)

[12]    We note the trial court alerted the parties that it planned to provide the premeditation and deliberation instruction to the jury before the prosecution rested.

[13]    Similarly, we reject defendant's underdeveloped argument that trial counsel rendered ineffective assistance by failing to raise this issue below, as defendant has not demonstrated prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692, 697 [to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, *and* (2) the deficient performance prejudiced defendant].)

V

*Supplemental Briefing*

In supplemental briefing, defendant argues that recent passage of Assembly Bill No. 333, which became effective while this appeal was pending, requires reversal of the jury's gang enhancement findings.

The People concede defendant is entitled to the ameliorative effects of Assembly Bill No. 333's amendments to section 186.22. But they maintain that "[r]emand is unnecessary because, in light of the overwhelming evidence in the record, it is beyond a reasonable doubt that the jury would have found true the enhancement allegations under [Assembly Bill No.] 333 amendments."

We agree with the parties that Assembly Bill No. 333's ameliorative amendments to section 186.22 apply retroactively to defendant because his judgment is not final. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307-308 [discussing *In re Estrada* (1965) 63 Cal.2d 740]; *People v. Nasalga* (1996) 12 Cal.4th 784, 792 ["The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses."].)

And consistent with multiple recent published decisions analyzing this same issue, we conclude "the amendments to section 186.22 apply retroactively here and that the . . . [gang] enhancement allegations that are based on that statute must be vacated and the matter remanded." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*); see *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823; *People v. Sek* (2022) 74 Cal.App.5th 657, 666-667.)

A. *Additional Background*

Among other things, the prosecution's gang expert testified that, "reputation to a gang is very important. If a gang is not feared or if they are not taken seriously, they are not going to have . . . the forced respect. . . . It's a forced respect through fear and intimidation." And later -- when the prosecutor asked the expert "what is it about

26

maintaining a reputation that is important?" -- the expert replied: "So without the fear and respect that they garner by -- how they earn that, if a gang -- if a gang is not seen -- is not seen as serious or they will follow through with their threats, they are just not going to be taken seriously, and they are going to be challenged by a rival gang . . . . Their reputation is everything in the community."

The expert later testified to "specific prior convictions of . . . gang members" from defendant's gang "for committing or attempting to commit . . . crimes listed in Penal Code [s]ection 186.22[, subdivision ](e),"[14] including unlawful firearm possession and carrying a concealed firearm.

The trial court instructed the jurors: "If you find the [d]efendants guilty of the crimes charged . . . , you must then decide whether for each crime the People have proved the additional allegation that the [d]efendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang. . . . [¶] . . . [¶] A criminal street gang is any ongoing organization, association, or group of three or more persons . . . whose members . . . engage or have engaged in a pattern of criminal gang activity."

In closing argument, the prosecutor reminded the jurors why they "heard a whole day of testimony from [the gang expert] about the gang associations, about all of the different gang elements, the pattern crimes": because "[f]our people setting out to kill someone makes no sense, absent th[e] [gang] angle of the case." The prosecutor continued: "There are other elements to the gang allegation as well. I didn't go through those . . . but this is why you heard about all these random other people who are involved

---

**14** At the time of trial, section 186.22, subdivision (e) provided: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses . . . : [¶] . . . [¶] (31) Prohibited possession of a firearm . . . . [¶] (32) Carrying a concealed firearm . . . ." (Stats. 2017, ch. 561, § 178.)

27

who had these prior convictions leading up to the shooting. . . . These are other gang members who have engaged in a pattern of criminal gang activity related to this gang."

B. *Assembly Bill No. 333's Relevant Changes to Section 186.22*

Relevant here, and effective January 1, 2022, Assembly Bill No. 333 "altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang. [Previously], a 'pattern of criminal gang activity' mean[t] 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons].' (§ 186.22, [former] subd. (e).) As of the effective date, Assembly Bill 333 redefines 'pattern of criminal gang activity' to require that . . . 'the common benefit of the [predicate] offenses is *more than reputational*.' (Assem. Bill [No.] 333, § 3; amended § 186.22, subd. (e)(1), eff. Jan. 1, 2022.)" (*Lopez*, *supra*, 73 Cal.App.5th at p. 345, italics added.)

"Thus, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational.' " (*Lopez*, *supra*, 73 Cal.App.5th at p. 345.)

C. Analysis

"[A]s the trial took place long before [section 186.22] was amended, the jury was not asked to, and therefore did not, make the factual determinations that are now required by the amendments to [the statute]." (*Lopez*, *supra*, 73 Cal.App.5th at p. 346.) And -- given the expert's testimony that (a) "reputation to a gang is very important," as it leads to "forced respect through fear and intimidation," and (b) a gang's "reputation is everything in the community" -- we disagree with the People's contention that "it is

28

beyond a reasonable doubt that the jury would have found true" that the common benefit of predicate offenses the expert told the jury about was *more than reputational*.[15] (Cf. *Lopez*, *supra*, 73 Cal.App.5th at p. 346 ["To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [defendant's] right to a jury trial on all the elements of the charged allegations"]; *People v. Sek, supra*, 74 Cal.App.5th at p. 669 [vacating jury's gang enhancement findings where "[a]lthough there was a great deal of evidence of benefits to the gang that went beyond reputational, [the court could not] rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true"].)

We conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22. (*Lopez*, *supra*, 73 Cal.App.5th at p. 346; see *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, & fn. 2, [remand appropriate to allow prosecution to establish additional element retroactively added by statutory amendment; no violation of the double jeopardy clause or constitutional restrictions against ex post facto legislation].)[16]

---

[15] Accordingly, given the record in *this* case, the People's invocation of *People v. Nasalga*, *supra*, 12 Cal.4th at page 798, for the proposition that, in *some* cases, remand may be unnecessary ("where evidence in the record le[aves] 'nothing additional to prove under the amended version of [an] enhancement' ") is unavailing.

[16] Given our conclusion that the gang enhancements must be vacated on this basis, we need not consider defendant's additional arguments why other provisions of Assembly Bill No. 333 require vacatur of his gang enhancements. (Cf. *People v. Rodriguez*, *supra*, 75 Cal.App.5th at pp. 822-823 & fn. 19 ["vacat[ing] all gang enhancements" because "[n]ow, the law requires 'the . . . common benefit of the offense [to be] more than reputational' "; and declining to "address other arguments Assembly Bill [No.] 333 requires reversal"].) Also given our conclusion vacating the gang

29

DISPOSITION

The convictions are affirmed. The gang enhancement allegation findings under section 186.22 are vacated, and the matter is remanded to the trial court to (1) give the prosecution an opportunity to retry the section 186.22 enhancements under the law as amended by Assembly Bill No. 333; and (2) resentence defendant as appropriate. In resentencing defendant, the term for the firearm enhancement may not be doubled pursuant to the Three Strikes law. In all other respects, the judgment is affirmed.


　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　HOCH, J.


We concur:


　/s/
MAURO, Acting P. J.


　/s/
EARL, J.

---

enhancements, we deny as moot defendant's motion to join in the section 1109 argument raised in codefendant Ackerson's related appeal in case No. C090994.